No. 116,223

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TABITHA CARTER,
*Appellant*.


SYLLABUS BY THE COURT

1.

Under the Kansas aggravated-robbery statute, the defendant commits an aggravated robbery when the taking of property by force or by threat of bodily harm comes when the defendant is armed with a dangerous weapon or the defendant inflicts bodily injury on someone while carrying out the robbery.


2.

To determine whether a defendant was armed with a dangerous weapon for purposes of the aggravated-robbery statute, Kansas courts apply a subjective test that looks at whether the victim perceived the weapon as dangerous.


3.

In this case, in which the victim raised her hands when the defendant pulled out a Taser, the victim told a 911 operator that she had been threatened with a weapon, and the jury reviewed a videotape of the events, sufficient evidence supports the defendant's conviction for aggravated robbery.

4.

Under the Kansas Offender Registration Act, a deadly weapon is a firearm or other device, instrument, material, or substance that, from how it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

5.

In a case in which no evidence showed that a Taser is a deadly weapon, the defendant's use of a Taser when committing an aggravated robbery does not trigger the registration requirement applicable to a violent offender under the Kansas Offender Registration Act.

Appeal from Sedgwick District Court; BENJAMIN L. BURGESS, judge. Opinion filed April 27, 2018. Affirmed in part and vacated in part.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and POWELL, JJ.

LEBEN, J.: Tabitha Carter brought a Taser with her when she robbed a Wichita Dollar General store. That led to her conviction for aggravated robbery under a statute that applies when the robber is "armed with a dangerous weapon." And it led to a requirement that she periodically register her residence with authorities under a statute that applies when a person "use[s]" a "deadly weapon" when committing a felony against a person. On appeal, Carter contests both her conviction and the registration requirement.

Carter argues that she wasn't armed with a dangerous weapon because a Taser isn't truly dangerous and she didn't show the weapon until she had already gotten the money

2

from the store safe. But the Kansas Supreme Court has held that—to support a charge for aggravated robbery—the weapon used need only *appear* dangerous if the robber deploys it in a manner intended to convince the victim it's dangerous and the victim reasonably believes that it is. See *State v. Colbert*, 244 Kan. 422, Syl. ¶ 3, 769 P.2d 1168 (1989). That was true here, and the weapon was shown as Carter was still gathering the money. So we affirm her conviction for aggravated robbery.

But Carter's argument against the registration requirement is a good one. What's important for that purpose is whether Carter *used* a deadly weapon, not whether the weapon might have appeared to be one. And although deaths can result from Taser use, that's usually not an intended or likely result. So we conclude that a weapon is a deadly one only when, as used, the weapon is likely to cause death. We therefore vacate the registration requirement.

FACTUAL AND PROCEDURAL BACKGROUND

Carter wore a clown mask when she robbed the Dollar General store, so for a time the police didn't know who had committed the crime. But in this appeal Carter's not contesting that she was the robber, so we start with the knowledge that she was the person behind the mask.

Two women, Kaylan Sanders and Celia Reyes, were working the closing shift that night. Reyes testified at trial that she saw something in Carter's hands and wondered whether it might be a gun. Reyes said she did not want to be shot and was also concerned for Sanders, so Reyes led Carter to the cash register. Sanders came with Reyes.

Carter told the women, "Give [me] all of the money," and said that she wasn't playing. Even so, there was a brief wait by the cash register and an accompanying safe because the safe compartment was designed to open only after setting a timer. While

3

waiting for the safe to open, Reyes and Sanders gave Carter the money from the store's cash-register drawers. Once the safe opened, Reyes and Sanders helped put the remaining money into the bag Carter had placed on the floor.

Carter pulled out what the witnesses later described as a Taser shortly after Reyes had emptied the safe. Until that point, Sanders said she hadn't known Carter had a weapon. After seeing the weapon, the women put their hands up. Reyes pleaded, "No, please," and Sanders said at trial that she had feared that she and Reyes were about to be tased. Carter instead ran from the store, taking $3,440 in cash.

At trial, Carter claimed to have been babysitting at the time of the crime, and a friend of Carter's corroborated that claim. But a sheriff's deputy who was Carter's long-time friend testified that Carter had confessed to her, and the jury convicted Carter of aggravated robbery. The district court sentenced Carter to 36 months in prison. The court also found that Carter had used "a dangerous weapon," which triggered a registration requirement for violent offenders under the Kansas Offender Registration Act.

Carter has appealed to our court. She challenges both the conviction and the finding that she must register under the Kansas Offender Registration Act.

ANALYSIS

I. *The State Presented Enough Evidence to Convict Carter of Aggravated Robbery.*

Carter's first claim is that the State didn't present enough evidence to convict her of aggravated robbery. When the defendant challenges the sufficiency of evidence in a criminal case, we look to see whether the evidence, when viewed in the State's favor, was enough so that a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1022-23, 399 P.3d 194 (2017). We

4

look at the evidence in the light most favorable to the State because the fact-finder (here, a jury) has already found in the State's favor. Our job on appeal, of course, is not to reweigh the evidence; we simply decide whether it was enough to support the fact-finder's conclusion. 306 Kan. at 1022-23.

Let's start by considering Carter's argument that a Taser isn't a dangerous weapon. Carter argues that Tasers were designed *not* to cause death or serious bodily injury. Even so, as Carter recognizes in her brief, we are considering whether a Taser is a dangerous weapon in the context of an aggravated-robbery charge. And Kansas courts have applied a subjective test when determining whether something is a dangerous weapon under the aggravated-robbery statute. That's because of what makes the crime an aggravated robbery.

A simple robbery is (1) the taking of property from the person or presence of another (2) by force or by threat of bodily harm. It becomes an aggravated robbery if (1) the taking of property (2) by force or by threat of bodily harm (3) came when the defendant was armed with a dangerous weapon or the defendant inflicted bodily injury on someone while carrying out the robbery. See K.S.A. 2014 Supp. 21-5420. In Carter's case, the State charged that Carter took the property from Sanders' presence by threat of bodily harm and charged an aggravated robbery because it alleged Carter had been armed with a dangerous weapon.

When the robbery is carried out by threat of force, the crime necessarily involves both a threat and the response of a victim—from whom the property is taken by threat. So when considering whether a defendant was armed with a dangerous weapon, we apply a subjective test (how the object appeared to the victim) rather than an objective one (whether the weapon truly was dangerous). *State v. Colbert*, 244 Kan. 422, Syl. ¶ 3, 769 P.2d 1168 (1989). Under that test, Kansas courts have found a starter pistol, an unloaded BB pistol, and a defective gun that couldn't be fired to be dangerous weapons that made

5

an otherwise ordinary robbery an aggravated one because of the victim's perception that the weapon was dangerous. See *State v. Davis*, 227 Kan. 174, 177, 605 P.2d 572 (1980) (starter pistol); *State v. Prince*, 227 Kan. 137, 141, 605 P.2d 563 (1980) (unloaded BB pistol); *Colbert*, 244 Kan. 425-26 (defective gun that couldn't be fired).

The State presented sufficient evidence to show that Sanders, who was listed in the criminal charge and the jury instructions as the victim, viewed Carter's weapon as a dangerous one. A store video showed that Sanders (and Reyes) both raised their hands right away once Carter pulled the Taser out. Sanders told a 911 operator that there was a weapon but she didn't know what it was. Sanders and Reyes both answered yes when the 911 operator asked whether the person had threatened them with the weapon.

Even before showing the weapon, Sanders said the robber had been "yelling in like an aggressive tone," "[t]elling us to give [her] all of the money, and that [she wasn't] playing, and to hurry up." That too would have led Sanders to believe the weapon, once displayed, was a dangerous one. The jury could have reasonably concluded that Sanders perceived the weapon Carter displayed to be a dangerous one.

Carter has a second argument that the evidence didn't prove an aggravated robbery. Under Kansas law, the difference between theft and robbery is whether the property had already been taken before the force or threat occurred. Unless the force or threat precedes or is contemporaneous with the taking of the property, it's just a theft, not a robbery. *State v. Bateson*, 266 Kan. 238, Syl. ¶ 2, 970 P.2d 1000 (1998). Here, of course, the charge was aggravated robbery, so the State had to show that the use of a dangerous weapon—through which the threat of force was enhanced—took place before or during Carter's taking of the money.

Carter argues that the Taser didn't come out until the money was already in the bag—and that putting the money in the bag completed the robbery. In her appellate brief,

6

she provides a timeline from the store video, suggesting that the last money was put in the bag at 10:01:53. She says that the video then shows Reyes and Sanders putting their hands up at 10:02:08—15 seconds later. Presumably, under Carter's view of the evidence, the Taser came out sometime during those 15 seconds but *after* the last money was put into the bag. And she cites Sanders' own testimony that it was only "[o]nce we put everything in" the bag that Carter "pulled out a Taser."

But there was some evidence that a weapon was displayed much earlier. Reyes testified that she saw something that she had thought might be a gun shortly after Carter entered the store.

Carter suggests that we should disregard Reyes' testimony because the State suggested at trial that it was likely that Reyes helped Carter commit the robbery. If we were to disregard Reyes' testimony, that would eliminate the only testimony saying that Carter appeared to have something in her hands—perhaps a gun—even before she demanded the store's cash.

We need not disregard Reyes' testimony altogether, but Carter is right that we must consider it within the context of the State's charge against Carter. Because the State's theory was that Reyes was in on the crime, the State's charging document and the jury instructions identified only Sanders as the victim in whose presence property was taken. So while the jury heard and considered Reyes' testimony, it did so in determining—under its instructions—whether Carter had taken property in the presence of *Sanders* by threat of bodily harm while armed with a dangerous weapon. The jury could properly consider Reyes' testimony, but within that context.

In that context, Carter's argument cuts things too finely. She identifies a 15-second period during which she says that money was being put in the bag, the Taser came out, and two people raised their hands. In our viewing of the video, it's hard to tell exactly

7

when the Taser comes out vis-à-vis the final placement of money into the bag. Carter pulling out the Taser is obscured by Reyes and Sanders, who are between the camera and Carter. But the video shows Reyes and Sanders raising their hands while Carter is still on her knees, apparently arranging things in the bag before stuffing the bag into the coveralls she was wearing.

It's possible that Carter was still placing cash from the safe into the bag. We can't be sure what she was doing because by that moment her back was to the camera. Given the short time frame at issue (suggested by Carter to be 15 seconds) and the ambiguity of the video, the jury could have reasonably concluded that Carter displayed the Taser contemporaneously with taking control of the money. The jury could have concluded that she displayed the Taser to help her gain complete control of the cash, not merely to facilitate escape, and that's sufficient to convict her of aggravated robbery. See *State v. Dean*, 250 Kan. 257, 260, 824 P.2d 978 (1992) (holding that the taking of gasoline was not complete when the gas was put into defendant's car's gas tank, so defendant's indication to the service-station owner that defendant had a gun before driving away supported aggravated-robbery conviction). Cf. *State v. Aldershof*, 220 Kan. 798, 803-04, 556 P.2d 371 (1976) (holding that the taking of a purse was completed when a purse-snatcher left a tavern with it, so a fight in the parking lot when someone tried to take the purse back and a fight ensued didn't make the theft an aggravated robbery); *Bateson*, 266 Kan. at 246 (holding that taking of cash was complete when defendant left victim's office with it).

II. *Carter Isn't Covered by the Kansas Offender Registration Act Because She Didn't Use a Deadly Weapon When Committing This Crime.*

Carter separately challenges the district court's finding that she "used a deadly weapon" when she committed this crime. That's important because under K.S.A. 2015 Supp. 22-4902(e)(2), that finding made Carter a "violent offender" under the Kansas

Offender Registration Act. Among other circumstances, a "violent offender" is one who commits any person felony (here, aggravated robbery) and "use[s]" a deadly weapon "in the commission of such person felony." There are also some specific crimes, like murder and kidnapping, for which a conviction makes the defendant a violent offender for registration purposes even if the defendant did not use a deadly weapon. See K.S.A. 2015 Supp. 22-4902(e)(1).

Carter argues that she didn't use a deadly weapon under the plain language of the Registration Act. We agree.

When we interpret statutes, we give common words their ordinary meanings. *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 850, 397 P.3d 1205 (2017). "Deadly" means "[c]ausing or tending to cause death: *deadly weapons*." American Heritage Dictionary 465 (5th ed. 2011). Black's Law Dictionary provides a more precise legal definition of "deadly weapon," but it too emphasizes that under the ordinary meaning, the weapon must be used in a way that's at least likely to cause a death: "Any firearm or other device, instrument, material, or substance that, from the manner in which it is used or is intended to be used, is calculated or likely to produce death." Black's Law Dictionary 1827 (10th ed. 2014).

There's nothing subjective at issue here—under its plain language, the registration requirement applies when the offender *uses* a *deadly* weapon, not when someone perceives a BB gun as a Glock pistol. So the question we must consider is whether the State proved to the district court that the weapon it alleged Carter used—a Taser—was a deadly weapon.

Before we answer that question, we must make a refinement to our definition of "deadly weapon," one that may go slightly beyond ordinary meaning. That's because there's existing caselaw defining that term in the context of the Kansas statute for

9

aggravated battery—where an objective definition of deadly weapon applies—saying that a deadly weapon is one that may cause death *or* serious bodily injury. As the court put it in *Colbert*, a deadly weapon under the aggravated-battery statute "is an instrument which, from the manner it is used, is calculated or likely to produce death or serious bodily injury." 244 Kan. 422, Syl. ¶ 4. The court got that definition from an earlier Kansas case, *State v. Hanks*, 236 Kan. 524, 537, 694 P.2d 407 (1985), which had cited the fourth edition of Black's Law Dictionary for that proposition.

Indeed, that edition of Black's said a deadly weapon was one that might "produce death or serious bodily injury." Black's Law Dictionary 487 (4th rev. ed. 1968). We note that more recent editions of Black's, under the direction of the current editor, Bryan Garner, have stressed that deadly means deadly, not nearly so. Accordingly, from the seventh edition, published in 1999, through the tenth edition, published in 2014, Black's has defined a deadly weapon as one that "is calculated or likely to produce death." Black's Law Dictionary 1587 (7th ed. 1999); Black's Law Dictionary 1827 (10th ed. 2014).

Perhaps this makes only a theoretical difference, anyway. We are at a loss to think of a weapon that would be likely to produce serious bodily harm that wouldn't also be likely to cause a death. In any event, since the Kansas Supreme Court has applied an objective definition of deadly weapon that includes ones calculated or likely to produce either death or serious bodily injury—and we must follow its caselaw determinations— we too apply that definition.

When we do so, we find that the State presented no evidence at trial that a Taser is a deadly weapon. And without evidence on that question, there's no basis in our record to conclude it is—and thus no basis to find Carter a "violent offender" under the Registration Act. There's certainly no common knowledge that a Taser is a deadly weapon in the sense that it's likely to cause death.

10

The Taser, of course, was designed as a *nonlethal* alternative to the use of deadly force by law-enforcement officers. See *Smith v. LePage*, 834 F.3d 1285, 1290-95 (11th Cir. 2016); *Fils v. City of Aventura*, 647 F.3d 1272, 1289-90 (11th Cir. 2011). Indeed, fellow officers are often tased in training exercises. See, e.g., *Butler v. Taser International, Inc.*, 535 Fed. Appx. 371, 372 (5th Cir. 2013) (unpublished opinion); *Powers v. Taser International, Inc.*, 217 Ariz. 398, 399, 174 P.3d 777 (Ariz. App. 2007). "A Taser is thus fundamentally different than [traditional firearms], which are specifically designed to deliver deadly force with every pull of the trigger . . . ." *Robinson v. Brassel*, No. 16-0376-WS-B, 2017 WL 2437265, at *12 (S.D. Ala. 2017).

We do not suggest that Tasers cannot cause death or serious injury. They can. See Nagy, American Law of Products Liability 3d § 106:52 (2018). But that's neither part of the product design nor how the weapon was used here. Because no evidence showed that the weapon Carter possessed was designed to kill or used in a manner likely to cause death—or even serious bodily injury—we conclude that Carter didn't use a deadly weapon when she committed the robbery.

Having set out our analysis and conclusion, we turn to three arguments made by the State in opposition to Carter's claim on this issue.

First, the State argued that we should not consider the issue at all since Carter didn't raise it before the trial court. As both parties recognize, claims not made before the trial court generally cannot be raised on appeal. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). But there are exceptions to that general rule, and we agree with Carter that the issue may be addressed here on appeal because it presents only an issue of law and because consideration of it is necessary to serve the ends of justice. See 301 Kan. at 1043; see also *State v. Ibarra*, 307 Kan. 431, 432, 411 P.3d 318 (2018) (addressing challenge first made on appeal to registration order).

Second, the State notes that our Supreme Court found the term "dangerous weapon" synonymous with the term "deadly weapon" in *Colbert*. See 244 Kan. 422, Syl. ¶ 2. But the court did so in *Colbert* in a very specific context—interpreting the statute setting out the elements of the crime of aggravated robbery. In that context, in which the defendant was armed with a deadly weapon while carrying out a robbery, the court was applying a *subjective* test to determine whether the weapon was deadly. In that context, finding "deadly" and "dangerous" weapons roughly equivalent makes sense—in either case, the victim could perceive that the defendant was "armed with a dangerous weapon," which is what that statute required. See K.S.A. 2014 Supp. 21-5420.

But here, we are interpreting a different statute, the Kansas Offender Registration Act. Under it, the Kansas Legislature determined that registration was required when a defendant commits a person felony and "use[s]" a "deadly weapon." There are two key points in that statutory language—the weapon must be *used* by the defendant and the weapon must be *deadly*. Nothing in that language suggests a subjective test, as was at issue in *Colbert*. Had the Legislature wanted a merely dangerous weapon to qualify here, it could have easily said so. See K.S.A. 2015 Supp. 22-4902(e)(2).

Last, the State cites a prior case in which our court applied a subjective test under the Kansas Offender Registration Act and applied *Colbert* to consider a dangerous weapon to be a deadly one for registration purposes. See *State v. Franklin*, 44 Kan. App. 2d 156, 234 P.3d 860 (2010). We simply cannot agree with the *Franklin* opinion on these points, largely for the reasons we've already discussed.

The defendant in *Franklin* had noted that an objective test is used to determine whether a weapon is a deadly one under the aggravated-battery statute. The defendant then argued that this standard used under the aggravated-battery statute—an objective one—should be used to determine whether a weapon is dangerous under the Registration Act. The underlying offense in *Franklin*, though, was aggravated robbery, not aggravated

12

battery. So the *Franklin* panel from our court found the defendant's argument that the standard used under the aggravated-battery statute should apply "to be a tortured and illogical interpretation of the statutory scheme." 44 Kan. App. 2d at 160.

The *Franklin* defendant's argument was a bit off the mark. But the point that was missed was that neither the aggravated-robbery statute nor the aggravated-battery statute answered the question of whether registration was required. That question is answered by a separate statute, the Kansas Offender Registration Act. And its language is straightforward: the defendant had to have used a deadly weapon when committing the offense. K.S.A. 2015 Supp. 22-4902(e)(2).

The *Franklin* panel offered one other rationale for its decision—that not requiring registration in that case (where the defendant used a BB pistol) would be "inconsistent with the legislature's likely intent" and the statutory purpose of protecting public safety by having violent offenders register their presence in the community with local authorities. 44 Kan. App. 2d at 160. But merely knowing that the Legislature sought to protect public safety doesn't tell us *how far* the Legislature intended the statute to reach toward that purpose. We determine the statute's reach by its words. We cannot read the words used in the Registration Act to cover the weapon here or in *Franklin*. Neither was a deadly weapon under the ordinary meaning of that term.

Finally, we note some language from a recent Kansas Supreme Court opinion that's consistent with our conclusion. In *State v. Marinelli*, 307 Kan. 768, ___ P.3d ___ (No. 111,227 filed April 13, 2018), the court reviewed a trial-court finding that a knife used in committing an aggravated assault was a deadly weapon under the Registration Act. In *Marinelli*, the prosecutor said at a plea hearing that "the deadly weapon used in the commission of the crime was a knife" and the defense agreed. 307 Kan. at 789. Thus, the parties in *Marinelli* agreed on the factual basis for an aggravated-assault charge. In that context, our Supreme Court noted that the *Marinelli* case was "not a situation in

13

which the weapon constituted a deadly weapon for the purposes of the criminal conviction but was arguably not a deadly weapon for [Registration Act] purposes." See 307 Kan. at 789 (citing *Davis*, 227 Kan. 174, in which a starter pistol was considered a deadly weapon under the subjective test applied under the aggravated-robbery statute). The court said it was not deciding "these potential asymmetries today" but that "district courts should be alert for them when complying with [the Registration Act]." 307 Kan. at 789. The court's message to district courts is consistent with our conclusion that even though an item may qualify as a deadly weapon for some purposes under a subjective test, it still might not be a deadly weapon for registration purposes under the objective test applied under the Registration Act.

Our disagreement with *Franklin* perhaps provides a good example of how caselaw can develop in Kansas. We have a single statewide intermediate appellate court, not the separate geographically designated courts of appeal that exist in some other states and on the federal level. In Missouri, for example, where there are three separate courts of appeal, the Court of Appeals for the Western District of Missouri might disagree with a decision of the Court of Appeals for the Eastern District. That would then set up the issue for further review by the Missouri Supreme Court.

In Kansas, one of the factors our Supreme Court must consider when deciding whether to grant review of a decision from our court is the existence of a conflict between two Court of Appeals decisions. See K.S.A. 20-3018(b). That can happen—even with a single statewide intermediate appellate court like we have in Kansas—because we sit in three-judge panels that need not follow the decisions of other panels when we conclude that an earlier decision was incorrectly decided. See *State v. Fahnert*, 54 Kan. App. 2d 45, 56, 396 P.3d 723 (2017); *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012). We do not do so lightly, but this is one of the aspects of Kansas court procedure that helps us, over time, to get things right.

14

We do not know whether the State will seek review of our ruling on this point by the Kansas Supreme Court or whether, if it does, the court will grant it. Meanwhile, with two conflicting published opinions from our court, a Kansas district court could choose to follow either this opinion or *Franklin*. That's because while one panel of this court may disagree with another, a panel cannot overrule another panel. Only our court acting en banc can do that. And we rarely sit en banc, in part because any disagreement of importance between our panels ultimately will be determined by the Kansas Supreme Court.

We vacate the district court's order that Carter comply with the Kansas Offender Registration Act. In all other respects, we affirm the district court's judgment.