NOT DESIGNATED FOR PUBLICATION

No. 119,349

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PIERRE P. WALKER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed November 27, 2019. Affirmed in part and dismissed in part.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., BRUNS, J., and WALKER, S.J.

PER CURIAM: After a jury trial, Pierre P. Walker was found guilty of three counts of aggravated robbery and one count of cruelty to animals. Walker appeals, arguing that he should have a new trial because of improper comments by the prosecutor during closing arguments, erroneous admission of Facebook pages into evidence by the district court, and because the Kansas Offender Registration Act (KORA) was applied to him in an unconstitutional manner. Finding no merit to Walker's claims on the first and third issues, we affirm as to those. We dismiss his evidentiary claim as not properly preserved for appeal.

1

After two jury trials that resulted in deadlocked juries, Walker was convicted of three counts of aggravated robbery and one count of cruelty to animals at a third jury trial in January 2018.

Walker's convictions stem from a series of robberies that took place in Lawrence during the early morning, predawn hours of June 6, 2016. The first victim, Ben Foley, was walking past a grocery store on his way to his job when a vehicle stopped abruptly behind him and three men leapt out. While one man held a shotgun on Foley, the others went through Foley's pockets and backpack. The men took Foley's driver's license, debit card, bus pass, keys, and cellphone and then drove away through a parking lot.

The next incident occurred shortly after the first. While Verdell Taylor was out for his usual morning walk by a park in his neighborhood, he noticed a vehicle in a nearby parking lot. He saw the vehicle exit the lot and drive straight to him. Three men then jumped out. One man held a sawed-off shotgun on Taylor while the other two men approached Taylor. Taylor turned to run but fell forward on the ground. One of the men straddled him and went through his pockets, finding and taking his cellphone.

The third event occurred around the same time at another local park. Jonathan Schuster was walking his dog, Phoebe, when he heard a vehicle stop right behind him on the road. Two men jumped out. One demanded Schuster turn over his iPod, while the other pointed what looked like a shotgun at Phoebe. Schuster lost the struggle to keep his iPod and heard a loud noise. He turned to look at Phoebe, who was whimpering. Schuster ran to his nearby apartment to get his car so he could take Phoebe to the veterinarian. But by the time he returned, Phoebe had died of a gunshot wound and the police had arrived on the scene.

The three victims similarly described the vehicle and the assailants. Foley recalled that the vehicle was a tan-colored sport utility vehicle with a luggage rack. The men had dark skin, and the one with the shotgun had dark hands, was approximately 6 feet tall, and wore a red baseball cap. Taylor also said the vehicle was an SUV, and described it as a darker color such as gray, green, or blue. He described the person with the gun as a slender man of color, standing between 5'10" and 6'1". The other two men were also of color but shorter. Taylor remembered the gunman's eyes and was later able to identify Walker from a photograph in the local newspaper because of his distinctive eyes. Schuster described the vehicle as a small, neutral-colored SUV, and the men as African-American. Schuster described the man who took his iPod as slender, having a moustache, standing approximately 5'10" or 5'11", and wearing a baseball cap.

Law enforcement officers used a feature on Taylor's cellphone to track it to a residence in Kansas City, Kansas. Kansas City officers saw a small, light green SUV at the location. The officers discovered a shotgun shell inside the SUV. The shell was similar to the one found near Phoebe.

Further investigation of the SUV revealed that the owner was Milton Owens. He had reported the SUV as stolen on May 24, 2016, approximately two weeks before the robberies in Lawrence. Owens had allowed another man, Charles Burke, to drive his SUV. Burke reported that a known acquaintance, Walker, and two other men had robbed him with two guns, one of which was a shotgun. Burke testified that it was Walker who had the shotgun.

Officers obtained and executed a search warrant on Walker's Kansas City address. There they found Foley's driver's license, debit card, and bus pass in the same bedroom as they found several of Walker's personal papers, including his birth certificate and a current lease for the premises with his name on it. Investigators also found a sawed-off

3

shotgun behind a sectional couch, a variety of shotgun shells, a red and black baseball cap, and other papers that indicated Walker lived at the address.

In July 2016, the State charged Walker with three counts of aggravated robbery—a severity level 3 person felony—and one count of cruelty to animals—a nongrid, nonperson felony.

Walker's first two jury trials ended with hung juries. At his third trial, in January 2018, the jury saw numerous exhibits admitted into evidence, and heard testimony from all three Douglas County victims, other witnesses such as the SUV owner, Owens, and his friend, Burke, and numerous law enforcement officers regarding the investigation.

Taylor identified Walker as the man who "pointed the shotgun at [his] face." Law enforcement officers and a veterinarian identified Phoebe's wounds and pellets found in her wounds as consistent with a shotgun blast and shell fragments. Law enforcement testimony also established that the shotgun found in Walker's home fired the shell recovered near the dog's body. The district court also admitted into evidence photographs presented by the State of an SUV—consistent with the one the victims described—driving in the time period of the robberies through intersections in Lawrence, in the parking lot of the grocery store where Foley was robbed, and near the park where Taylor was robbed.

Also admitted into evidence at the State's request was a series of Facebook messages dated from May 27, 2016, to June 9, 2016. These messages indicated that a Pierre Walker wanted to sell a shotgun and also to obtain shotgun shells. In the hours leading up to the robberies, other messages showed this Pierre Walker making plans to collect some friends. Then, messages from after the robberies revealed that this same Pierre Walker still had a shotgun he wanted to sell.

4

Investigating officers testified that fingerprint and DNA analyses in the case were largely inconclusive. To illustrate, latent fingerprints found on key pieces of evidence such as Foley's recovered possessions and shotgun shells—both spent and intact—did not have sufficient characteristics for conclusive comparisons. Similarly, DNA swabs from the shotgun, its shells, the red and black baseball cap, and the bag containing Foley's driving license were all inconclusive. Fingerprints taken from a flyer about tax assistance found in a bag in Walker's bedroom—the same bag in which Foley's license was discovered—and from inside the SUV were the only useable prints collected and they did not match Walker's prints. Walker was excluded as the source of the print on the piece of paper.

After deliberations, the jury found Walker guilty of all three counts of aggravated robbery and the one count of cruelty to animals. The district court sentenced Walker to consecutive sentences for the aggravated robbery convictions and a concurrent sentence for his animal cruelty conviction, for a controlling prison sentence of 204 months, plus restitution and postrelease supervision. The district court noted that Walker committed his crimes with a deadly weapon—a firearm. Accordingly, the court ordered Walker to register as a violent offender for 15 years.

Walker timely appealed from his convictions and sentences, and requests a new trial.

ANALYSIS

*Allegations of prosecutorial error*

On appeal, Walker first claims the State committed prosecutorial error by misstating the evidence and shifting the burden to him during closing arguments. He argues we should reverse his convictions and remand his case for a new trial. The State

argues that it did not commit prosecutorial error and Walker's convictions should be affirmed.

In *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), the Kansas Supreme Court revamped the concept of and standard of review for "prosecutorial misconduct." In the context of whether a criminal conviction is reversible due to the inappropriate actions of a prosecutor during trial, the nomenclature has been changed to "prosecutorial error." 305 Kan. at 93. Under the *Sherman* standard, an appellate court uses a two-step process to evaluate claims of prosecutorial error, simply described as error and prejudice.

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citations omitted.]" *Sherman*, 305 Kan. at 109.

Even if a prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmless test. See 305 Kan. at 114.

6

As an initial matter, Walker acknowledges he did not object to the State's comments in its closing argument but accurately notes that a contemporaneous objection was not required to preserve this issue for appeal. A claim of prosecutorial error based on comments made during voir dire, opening statements, or closing argument will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012); see *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

On appeal, Walker argues the State committed prosecutorial error when it misstated the results of forensic testing by arguing in closing that the testing did not exclude him as a suspect. Walker also claims that this misrepresentation shifted the burden to him to establish he was not a suspect.

Although not regarding forensic evidence, Walker first challenges the State's comments in closing about the residence where key pieces of evidence such as the gun and Foley's license were found. He claims that the State's summary of that evidence—using phrases such as "'no other evidence that [he] lives anywhere [else],'" and "'[t]he only evidence you heard in this case is that the house on 4th Street is where [he] lived. You have not heard any evidence to the contrary'"—shifted the burden to him to establish another person possessed the evidence and to affirmatively establish his address elsewhere.

Walker then addressed his claim that the State misstated the results of forensic testing and specifically and exclusively raised as offensive this passage in the State's closing argument:

> "Now, the State presented lots of bits of evidence of DNA testing and latent print examinations, and *most* of those tests were inconclusive. There was nothing there that definitely pointed to [Walker] as owning *that shotgun or* touching *those cards*, but think

7

about this. Nothing excluded him. Nothing showed anybody else had *those things*."
(Emphases added.)

He argues this passage is contrary to the evidence presented at trial because a latent print on a tax assistance flyer—a "piece of paper"—excluded Walker as the source of that print.

In evaluating a prosecutor's closing arguments, context matters. "Appellate courts consider the prosecutor's comments in the context in which they were made rather than in isolation." *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018). A prosecutor's attempt to shift the burden to the defendant is improper. *State v. Stove*, 291 Kan. 13, 18, 237 P.3d 1229 (2010). A prosecutor also cannot suggest that a defendant must disprove the State's case. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014). Likewise, it is improper for a prosecutor to argue facts that are not in evidence. *State v. Ly*, 277 Kan. 386, Syl. ¶ 4, 85 P.3d 1200 (2004). However, identifying a lack of evidence supporting a defense theory or countering a defendant's argument about problems with the State's case is not burden-shifting. *State v. Haygood*, 308 Kan. 1387, 1401, 430 P.3d 11 (2018). Further, the State is granted "'considerable latitude . . . to comment on the weaknesses of the defense.'" *State v. Blansett*, 309 Kan. 401, 414, 435 P.3d 1136 (2019).

Jurors are presumed to follow the instructions provided by the district court. *State v. Rogers*, 276 Kan. 497, 503, 78 P.3d 793 (2003). And, when a jury is properly instructed on the burden of proof, a prosecutor is permitted to argue inferences based on "the balance or lack of evidence." *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). Walker does not claim that the jury failed in its duty to follow instructions or that the jury instruction on the State's burden of proof was improper. Issues not adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d

787 (2018). Likewise, a point raised incidentally in a brief and not argued therein is also deemed abandoned. *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015).

Again, a prosecutor's statements during closing arguments must be placed in context. They may summarize conclusions to which an assessment of the evidence could lead the jury. *Stone*, 291 Kan. at 20. In context, then, the State's comments in this case at closing summarized the evidence presented at the trial that supported Walker living at the residence. This evidence included a current lease in Walker's name—executed only a few months before the robberies—found in his bedroom along with his birth certificate. The State encouraged the jury to make inferences based on the evidence that Walker lived in this residence where law enforcement searched and located the items connected to the robberies. This invitation to make inferences based on the evidence of record did not shift the burden to Walker.

Additionally, the latent fingerprint was found on a piece of paper seemingly unrelated to the robberies. Walker was excluded as the contributor of this print; however, the State was not commenting in its closing on the piece of paper. Again, the State accurately said that *most* of the forensic testing was inconclusive, but also stated that none of the testing "definitively pointed to [Walker] as owning *that shotgun or* touching *those cards*, but . . . [n]othing showed anybody else had *those things*." (Emphases added.) Forensic testing did not exclude Walker from the shotgun or the cards related to the robberies. The State's point was that there was no forensic evidence linking Walker to or excluding him from the items of evidentiary value located in his residence. The State addressed a weakness in its case—the lack of direct or definitive forensic evidence—but also noted weaknesses in the defense and invited the jury to make inferences based on the evidence before it. This was not burden-shifting or a misstatement of the evidence.

Applying the above principles to the State's allegedly offending comments supports the conclusion that those comments did not fall outside the wide latitude of fair

9

argument afforded to prosecutors. The State did not shift the burden to Walker or misstate the evidence.

However, even if we were to conclude that the State's closing comments constituted error in some way, we would then need to proceed to the second step of the *Sherman* analysis—prejudice. See 305 Kan. at 109.

As noted above, *Sherman* instructs that our bottom line inquiry is whether the prosecutorial error was so grave that it prejudiced Walker's due process rights to a fair trial. And in doing so we are admonished that an error can be considered nonprejudicial only if it "did not affect the outcome of the trial *in light of the entire record*." (Emphasis added.) 305 Kan. at 109. In other words, only if there is no reasonable possibility that the error contributed to the verdict can we conclude that the error was harmless.

After carefully reviewing the record of Walker's third jury trial we are convinced that any prosecutorial error was de minimus and had no possibility of altering the verdict. Evidence at the trial which supports this conclusion include: the consistency and clarity of the testimony by all three victims in describing the SUV and the physical features of the perpetrators; the series of photographs placing the SUV, later identified as at Walker's residence, in close proximity to the crime scenes at matching times; police tracking of victim Taylor's stolen cellphone which allowed officers to pinpoint its presence in Walker's Kansas City residence; the fruits of the search warrant on Walker's residence which included the personal belongings taken directly from victim Foley; the presence of the sawed-off shotgun in Walker's residence and its forensic connection as the weapon that killed Phoebe; and the Facebook pages which connected Walker to the possession of a shotgun and ammunition at times closely before and after the Lawrence crimes. Even taking into consideration that virtually all the DNA and fingerprint testing in the case was inconclusive, we conclude that the State's other evidence was strong and clear circumstantial evidence of Walker's guilt.

10

Under the circumstances, we find that any prosecutorial error was harmless and that Walker's due process rights to a fair trial were not violated.

*Admission of Walker's Facebook records*

Walker's second issue on appeal is his contention that the district court erred in admitting Facebook records into evidence because the records were not properly authenticated. The State claims that Walker failed to properly preserve this issue for appeal but also argues that the records were properly authenticated.

"When the adequacy of the trial court's legal basis for admission of evidence is challenged, the appellate court will review the challenge under a de novo standard. [Citation omitted.]" *State v. Brown*, 307 Kan. 641, 644, 413 P.3d 783 (2018). When the question of whether the district court complied with specific statutory requirements for admitting evidence requires interpretation of a statute, appellate review is also de novo. See *State v. Stafford*, 296 Kan. 25, 47, 290 P.3d 562 (2012).

As a threshold matter, Walker claims that he preserved this issue for appeal because he objected to the admission of the Facebook records at trial. The State acknowledges Walker's objection to the district court but claims the timing of his objection presents a problem when it comes to preserving the issue for appellate review. Under K.S.A. 60-404, we are generally precluded from reviewing an evidentiary challenge absent a timely and specific objection made on the record. See *State v. Powell*, 308 Kan. 895, 917, 425 P.3d 309, 323 (2018). The record on appeal supports the State's argument.

Walker claims here that he made an appropriate objection to preserve this issue for appellate review. He cites to a section of the trial transcript just after the State called a detective from the Lawrence Police Department as a witness. The record reveals that

11

before the detective was asked any questions or even stated his name, defense counsel requested to approach the bench. At that time, defense counsel—outside the hearing of the jury—referenced a previous objection to the records and testimony, "and rather than regurgitate [*sic*] that, we would ask that the Court incorporate our prior arguments and objections to this evidence, and obviously, I would renew that objection now." The district judge speculated that defense counsel referred to Facebook communications. The State offered to provide pages from a transcript of the district court's ruling during one of the previous jury trials, which allowed admission of the Facebook evidence, for the court to incorporate into the current record. Defense counsel agreed with the State's suggestion and allowed the transcript of the court's prior ruling into evidence. The district court judge then stated, "Just to make the record clear, my ruling *at this point* would not change based upon the objections that you raised in October." (Emphasis added.)

The parties agree in their briefs that this exchange referenced Walker's objection to the Facebook records' admission at his second trial. Review of the second trial transcript reveals that after the State questioned the detective and then offered the Facebook records into evidence, Walker objected. Outside the presence of the jury, defense counsel objected to the Facebook records based on authentication—as it relates to relevance—and hearsay. The district court—at that time—found that the Facebook exchanges were not being offered for truth of the statements within them and so they were not hearsay. The district court found that Walker's comments and the content within the posts was relevant in potentially tying the shotgun to Walker. The court also found that many of the statements Walker made were against his interests, including those regarding planning and preparation, and were thus admissible as such. The district court also found that the content of the posts went to the weight of the records, not to their admissibility.

After the district judge's comment in this trial, the State began to question the detective. The detective gave his name and then testified for approximately eight pages regarding his experience, promotions, training, and his specialty and expertise regarding

electronic records. He testified regarding the search warrant obtained for collecting Walker's Facebook records. The detective described the Facebook records as "self-authenticating," and explained that term relative to Facebook's disclosure when it turned over the records, electronic media, user names, and passwords. He also explained the timestamps and time differences from where the records were generated. The detective also explained that he modified the records he obtained from Facebook to make them easier to read by italicizing and highlighting certain aspects of the records, but he did not change the records' content. The State then moved to admit the Facebook records.

The district court asked defense counsel if he had any objections. Counsel requested to voir dire the detective and then questioned him—in the presence of the jury—regarding the records' authenticity. Counsel questioned the detective for approximately seven pages in which the detective further explained about a user's unique Facebook identification number imbedded within the files received from Facebook. The detective explained that he was able to locate Walker's Facebook profile by using that ID number provided in the records. When defense counsel finished voir dire, he stated, "I have no objection to the exhibits, Your Honor." The district court then admitted the Facebook records into evidence, and the State resumed its examination of the detective.

As the State noted in its brief, the rationale for the contemporaneous objection rule is that a district court is not in position to fully consider whether to admit the evidence until the evidence is offered at trial because the "'[m]ateriality of the proposed evidence may not become actually apparent until other evidence has been admitted.'" *State v. Jones*, 267 Kan. 627, 638, 984 P.2d 132 (1999) (quoting *State v. Nunn*, 244 Kan. 207, 213, 768 P.2d 268 [1989]); see *State v. Holman*, 295 Kan. 116, 126, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Further, requiring an objection at the time the evidence is offered to preserve the issue for appeal is consistent with the language of K.S.A. 60-404 and allows a court to reconsider an earlier ruling after hearing how the evidence unfolds during the trial. See *State v.*

*Potts*, 304 Kan. 687, 700, 374 P.3d 639 (2016). Walker's objection to the Facebook records prior to any testimony or the State's motion to admit them was not contemporaneous with the offer of evidence.

Although Walker's objection was characterized as a "regurgitated" objection, to the degree that it could be considered a continuing objection, it still does not meet the contemporaneous objection rule. Even a continuing objection does not operate prospectively to preserve review of an unspecified future evidentiary issue. See *State v. Miller*, 293 Kan. 535, 553-54, 264 P.3d 461 (2011). This is particularly true in circumstances such as the present case. Here, Walker lodged his objection immediately after the State called its witness. Following a vague discussion of the objection and the evidence in question, the district court specified that its ruling on Walker's arguments raised in his previous trial would not change "at this point."

Moreover, Walker's premature objection before the State even began to question the detective left open the question of which statements or exhibits Walker might later contest. Although the district judge and the parties presumed from their previous experience at the second trial the context in which Walker was contesting the evidence, i.e., the entirety of the "Facebook communications," this presumption was not borne out because—when the time came—defense counsel explicitly and unequivocally did not object to the Facebook records' admission.

"[E]videntiary claims . . . must be preserved by way of a contemporaneous objection for those claims to be reviewed on appeal." *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). When the time came, Walker did not object to the admission of the Facebook records, so he cannot now challenge the district court's ruling. See *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, Syl. ¶ 6, 159 P.3d 1035 (2007) ("The trial court cannot be accused of abusing its discretion in the admission of evidence when the complaining party failed to object and thereby give the trial court an opportunity to exercise its

14

discretion on the matter."). The lack of a specific contemporaneous objection to the records in question precludes this court from considering this issue. See *State v. Bollinger*, 302 Kan. 309, 323-24, 352 P.3d 1003 (2015) (continuing objection does not take place of contemporaneous objection at time of testimony; defendant failed to preserve issue for appeal).

In short, not only did the defense counsel fail to lodge a contemporaneous objection to the detective's testimony about Walker's Facebook pages, he explicitly consented to their admission when the question was put to him. Under the circumstances we hold that this issue has not been properly preserved for appeal, and it is dismissed.

*Alleged unconstitutional application of KORA*

As his final issue, Walker claims that the district court improperly ordered that he register as a violent offender under the Kansas Offender Registration Act, K.S.A. 22-4901 et. seq. He contends this "additional punishment" was based on a factual finding by the district court—that he committed his crimes with a deadly weapon—in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 477, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and argues this order must be vacated. The State argues that Walker did not raise this issue below but also that this issue is long-settled against him.

Walker acknowledges he did not raise this issue below. Generally, issues not raised before the trial court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Likewise, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018).

But, as Walker notes, there are exceptions to this general rule. Those established exceptions which allow consideration of a new legal theory to be asserted for the first

15

time on appeal include:  (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case and (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). An appellant is required to explain why an issue that was not raised below should be considered for the first time on appeal. Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34); see *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (Rule 6.02[a][5] will be strictly enforced); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) (litigants who fail to comply with Rule 6.02[a][5] risk ruling that issue is improperly briefed, and issue will be deemed waived or abandoned).

Walker claims that this court can consider this issue because both of these exceptions apply—"this issue presents a question of law and involves [his] fundamental rights, i.e., the right to a jury trial." However, the first exception is not limited to whether the issue is a question of law but requires that the question turn on proved or admitted facts, and also that the issue be finally determinative of the case. Walker disputes the factual foundation for the order, he does not claim that the registration order is finally determinative of his case, and the order does not have any bearing on his convictions. The first exception clearly does not apply.

However, as Walker claims he had a right to have a jury determine any facts which increase a penalty, we may consider this issue under the fundamental rights exception. See *State v. Huey*, 306 Kan. 1005, 1009, 399 P.3d 211 (2017). This issue presents a question of law, so our review is unlimited. 306 Kan. at 1009.

Our Supreme Court has held that the requirement for a convicted felon to register under KORA does not constitute punishment; therefore, any fact-finding made by the district court to determine if registration is required is not unconstitutional. See *Huey*, 306 Kan. at 1009-10; see also *State v. Petersen-Beard*, 304 Kan. 192, 209, 377 P.3d 1127.

16

Walker acknowledges that precedent is against him but argues that the Kansas Supreme Court was incorrect to find that KORA is not "punitive in nature." However, again, the Kansas Supreme Court has repeatedly rejected the argument that offender registration under KORA is punishment. See, e.g., *State v. Watkins*, 306 Kan. 1093, 1095, 401 P.3d 607 (2017); *Huey*, 306 Kan. at 1009-10; *Petersen-Beard*, 304 Kan. at 209.

In *Huey*, the Kansas Supreme Court found that because the Kansas Legislature intended KORA to be a civil regulatory scheme—not punishment—a defendant must present "the clearest proof" that registration is punitive before the court would consider registration a criminal penalty. 306 Kan. at 1010. The court must consider several factors to determine whether KORA's effects render it punitive as applied to violent offenders. These questions are fact intensive and require a robust record. But Huey raised his *Apprendi* challenge for the first time on appeal and thus failed to present facts in district court which showed that the registration's effects on him were punitive. Without a record, the court held it could not conclude the effects of KORA were so punitive to override the Legislature's intent that KORA be a civil remedy. *Huey*, 306 Kan. at 1010. In our case, just as in *Huey*, Walker failed to raise the issue below. Consequently, he failed to present facts to establish that the effects of registration under KORA were of such a punitive nature that they overrode the intent of that legislation.

In fact, Walker's entire argument on this issue turns on whether there is a legally meaningful distinction between the jury's finding that he committed his crimes with a "dangerous" weapon versus a "deadly" weapon for registration purposes. Walker cites two Court of Appeals cases, which he acknowledges have somewhat inconsistent holdings on that distinction. The first is *State v. Carter*, 55 Kan. App. 2d 511, 517-18, 419 P.3d 55 (2018), *rev. granted* 309 Kan. 1350 (2019), which held the use of a stun gun during the defendant's crimes was not covered by KORA because the stun gun was not a deadly weapon. *Carter* also found the registration requirement applies when the offender uses a deadly weapon. 55 Kan. App. 2d at 517-18. Walker asks this court to compare

*Carter* with *State v. Franklin*, 44 Kan. App. 2d 156, 161-62, 234 P.3d 860 (2010), which held that a defendant's guilty plea to aggravated robbery where he used a dangerous weapon—a BB pistol—was an admission to an element of the crime, and use of a dangerous weapon was synonymous with "deadly weapon" for registration purposes under KORA. 44 Kan. App. 2d at 158-59. The *Franklin* panel also found that the defendant's constitutional rights under *Apprendi* were not violated by the registration requirement. 44 Kan. App. 2d at 161-62.

Both *Carter* and *Franklin* are Court of Appeals cases, and are not controlling, but merely persuasive authority—but even less so because of their inconsistencies. One Court of Appeals panel has the right to disagree with a previous panel of the same court, as the *Carter* panel did with *Franklin*. See *Graham v. Herring*, 297 Kan. 847, 861, 305 P.3d 585 (2013). However, there is "no authority for one panel of the Court of Appeals to disapprove or overrule a decision of another panel of the same court." *In re Marriage of Cray*, 254 Kan. 376, 382, 867 P.2d 291 (1994).

It is noteworthy that the jury instructions at Walker's trial defined "dangerous weapon" as "an instrument which, from the manner in which it is used, is *calculated or likely to produce death* or serious bodily injury." (Emphasis added.) Based on the jury instructions, Walker's claim that there is a meaningful distinction between the jury's finding he committed his crimes with a "dangerous" weapon and the district court's finding that the weapon was "deadly" is contradicted by the record. More importantly, this claim does not meet the requirement under *Huey* that Walker provide the clearest proof that KORA is punitive.

The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Meyer*, 51 Kan. App. 2d 1066, 1072, 360 P.3d 467 (2015). Recently, another panel of this court acknowledged it was duty bound to follow Supreme Court precedent, found that a

district court's registration order did not increase a defendant's punishment, and that it was unnecessary for a jury to find the defendant used a deadly weapon in the commission of his crime. *State v. Atkins*, No. 119,878, 2019 WL 4123070, at *6 (Kan. App. 2019) (unpublished opinion), *petition for rev. filed* September 18, 2019. There is no indication our Supreme Court is departing from its previous position. Consequently, *Huey* controls here and—absent some clear proof that Walker's registration is punitive—the district court's registration order must be affirmed.

Affirmed in part and dismissed in part.