NOT DESIGNATED FOR PUBLICATION

No. 119,399

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CALEB J. KANATZAR,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed February 7, 2020.
Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER, J., and LAHEY, S.J.

PER CURIAM: Caleb J. Kanatzar was charged with intentional second-degree murder for the killing of Terrin Holloway. At trial, Kanatzar admitted to stabbing Holloway but claimed it was done in self-defense, while the State argued it was an act of revenge. A jury convicted Kanatzar of the lesser included offense of voluntary manslaughter, and the district court sentenced Kanatzar to prison for 233 months. He appeals contending: (1) there was insufficient evidence to support the conviction for voluntary manslaughter; (2) it was clear error for the trial court to fail to instruct the jury on involuntary manslaughter; (3) the prosecutor committed reversible error during jury selection by diluting the State's "beyond a reasonable doubt" burden; (4) cumulative error

1

deprived him of a fair trial; and (5) the trial court incorrectly calculated his criminal history score. Finding no reversible error by the district court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Events leading to the death of Holloway*

Spencer Allen and Terrin Holloway were sometimes friends and roommates. In early December 2015, while Holloway was in jail, Allen stole Holloway's lawnmower and gave it to Kanatzar to repay a debt. Kanatzar knew the lawnmower was probably stolen but did not know it was taken from Holloway. After his release from custody, Holloway learned that Allen took the mower. As a result, Holloway committed a drive-by shooting of Allen's house. Amber Price, Allen's girlfriend and Kanatzar's cousin, was hit in the arm by the gunfire. The drive-by shooting occurred two days before Holloway was stabbed to death.

On the evening of December 12, 2015, Holloway told his brother he was in a "game of chess" in which he was "playing for lives" and he was going to "try to finish it." He was going to sleep easy one way or another that night. The brother understood this to mean that Holloway had to kill someone or someone was going to kill him. Holloway said, "It's too late to hope, hope's gone big bro." He said, "This is one bridge that needs to burn." The brother had heard that people were upset about the drive-by shooting, including relatives of Price, and knew that Price's cousin (Kanatzar) was a "dangerous mother-fucker."

After talking to his brother, Holloway met up with his friend, Jason Bulger. Bulger had been in Allen's house at the time of the drive-by shooting. Nonetheless, Bulger was going to show Holloway the house where he believed the lawnmower was located. He told Holloway that he had seen Kanatzar loading up a lawnmower from Allen's house.

2

Holloway told Bulger he felt bad about shooting Price, was sorry about it, and wanted Bulger to tell Allen that he still had love for him.

Holloway, with Bulger along for the ride, drove off to search for his lawnmower. He was armed with a revolver and dressed in a long black duster jacket. According to Bulger, Holloway was carrying the revolver in case he ran into people while attempting to reclaim his lawnmower. Along the way, Holloway placed the gun on the center console.

Holloway and Bulger pulled into a Kwik Shop gas station where, by chance, Kanatzar was there with his friend Autumn Eastman. Kanatzar was the passenger in Eastman's car. Holloway pulled up to the pumps directly behind Eastman. Holloway got out of his car but left it running. Bulger went immediately into the Kwik Shop.

Three witnesses and Kanatzar offered varying accounts of what happened next.

*Eastman's version of events*

On the evening prior to the stabbing, Eastman had been at Kanatzar's house to help him put up security cameras. She arranged to meet Matt Smith that evening to buy pain pills from him, and Kanatzar volunteered to go along with her. She ultimately told Smith she would meet him at a Kwik Shop. On the way, Eastman asked Kanatzar about the drive-by shooting in which Price was injured, but he did not want to talk about it. Eastman testified that Kanatzar was upset about Price being shot and that Price's two-year-old child was present in the house at the time.

Smith was already at the Kwik Shop when they arrived, and Eastman parked on the opposite side of the gas pumps from Smith. According to Eastman, she was out of the car talking to Smith when Holloway and Bulger arrived and pulled in behind Eastman's

car. The passenger, Bulger, got out of the car and went into the Kwik Shop. According to Eastman, she and Holloway were friends, and he typically carried a weapon. Holloway came over to Eastman, greeted her with a hug, and they chitchatted. Kanatzar was standing behind her, and he and Holloway introduced themselves and shook hands. Then Holloway walked toward the store. Kanatzar started walking toward Holloway's car and asked if there was anyone else in Holloway's car. Holloway turned and walked back toward the car. The two met between Holloway's car and the store. Eastman did not see or hear any conversation between Kanatzar and Holloway. She saw a movement that looked like Kanatzar punched Holloway in the stomach. Smith told her he thought Kanatzar stabbed Holloway, but she did not see any blood. Kanatzar immediately took off running. Holloway then reached into his car, retrieved his gun, and pointed it in the direction of Kanatzar. Eastman did not recall hearing any gunshots. Holloway then got in his car and drove out of the Kwik Shop in apparent pursuit of Kanatzar.

*Smith's version of events*

According to Smith, Holloway exited his vehicle and hugged Eastman between the two cars. Then Holloway headed for the store. Kanatzar started approaching Holloway's car, which was running and had music playing, and asked if anybody was in the car. Smith thought Kanatzar might steal the car. At that point, Holloway turned around and met up with Kanatzar near Holloway's car. They talked for a second, shook hands, and did a "half hug." Immediately thereafter, with no break in time, a "scuffle" happened. Smith saw Kanatzar hit Holloway in the ribs two or three times and it appeared to be a stabbing. Kanatzar ran away as Holloway grabbed a gun from the console of his car. Holloway pointed the gun in the direction that Kanatzar had run. Holloway opened his jacket and appeared to look himself over for wounds. He got in his car and pursued Kanatzar.

*Bulger's version of events*

As they pulled into the Kwik Shop, Bulger pointed out Kanatzar, saying, "Hey, there goes Caleb." Holloway responded, "Don't worry. I got it." Bulger then went inside the Kwik Shop to pay for gas. Holloway walked about halfway from the car to the store and from the outside signaled to Bulger how much he should pay for in gas. Then Holloway headed back to the car and disappeared out of sight. When Bulger saw him again seconds later from inside the store, Holloway was reaching into the car to grab the gun and then pointed the gun. Bulger immediately went outside. Holloway said, "He stabbed me." Holloway got in his car and took off. The surveillance video footage showed Holloway heading away from the store after signaling to Bulger, and then about 30 seconds later Bulger heading for the door. Bulger did not see the stabbing, and he did not hear any gunshots. According to Bulger, Holloway had a reputation for carrying a gun, even multiple guns. The only gun he saw that night was the one Holloway placed on the console.

*Kanatzar's version of events*

According to Kanatzar, Holloway and Kanatzar knew each other as kids but had not seen each other since then. However, Kanatzar said they had talked on the phone months before, and even a few days before the stabbing about plumbing and construction on the house Kanatzar was fixing up. According to Kanatzar, Holloway called Kanatzar the day before his death. Holloway said he wanted to meet up, but Kanatzar said he was kind of busy and not interested. He asked Holloway if he had done the drive-by shooting, but Holloway denied it.

When they ran into each other at the gas station, Holloway walked toward them and greeted Eastman. Then he turned to Kanatzar and said, "Just the man I was looking for." Kanatzar did not perceive this comment as threatening and was walking toward

5

Holloway to talk to him, but Holloway took off toward the store and stopped and waved at Bulger inside the store. Then he walked back. Holloway asked Kanatzar if he knew who he was. Kanatzar did. They shook hands and started walking side by side toward Holloway's car. Holloway asked how Price was doing. Kanatzar responded, "I don't know, probably not great, because you fucking shot her." Holloway said that was "too bad," but he was not trying to hit her, he was trying to hit Allen. Holloway then asked Kanatzar if Allen had given him a lawnmower. Up until that point, the conversation was friendly. When Kanatzar responded that he had, Holloway's tone changed and he asked, "Well, where the fuck is it?"

At this point, Holloway was standing next to his car with his back to it, and Kanatzar noticed that Holloway had a pistol lying on the console of his car within reach. The car window was open. Kanatzar was "on edge" then. Holloway suddenly reached his hands inside his duster jacket. Kanatzar did not see a gun in Holloway's jacket but assumed he was armed because Holloway had a reputation for carrying firearms on his person. Kanatzar thought that Holloway was grabbing a gun out of his coat. Holloway said, "Spencer robbed me. I want my shit back." Kanatzar said, "Whoa, fuck you, don't be trying to drag me into that shit. You need to talk to Spencer about that." Holloway responded, "Fuck you. You think you're going to help Spencer steal my shit and you're getting away with it, you fucking . . . ," said that he was going to shoot Kanatzar in the head, and then he "goes for it." Holloway began pulling his hands out of his jacket.

Kanatzar thought Holloway was going to shoot him, so he grabbed Holloway's left hand as it started to come out of the coat and reached for his pocket knife. Kanatzar carried this pocket knife every day and used it to renovate a house he was renting. Holloway was knocked back, and his right hand then came out of his coat and was used to catch his balance. There was no gun in Holloway's hand. Kanatzar was able to open his knife with his left hand by pushing a button, and he stabbed Holloway once. Kanatzar immediately took off running. He looked back and saw Holloway with the gun laid

6

across the top of the car pointing it at him. Kanatzar ran past the Kwik Shop into a residential area, and he heard tires squealing and a loud crash. Holloway came down the street, gun hanging out the car window, yelling, "I'll fucking kill you, I know where you live. You're dead." Kanatzar was hiding by a house and heard two gunshots but did not think they were aimed at him. Holloway then drove away. According to Kanatzar, it all happened "stupid fast." Kanatzar testified he did not intend to kill Holloway; he acted on instinct because he did not want to get shot. He just wanted to slow Holloway down so he could get away.

Kanatzar stabbed Holloway in the right upper quadrant of his abdomen. The Shawnee County Coroner, Dr. Charles Glenn, testified the knife went through Holloway's abdominal tissue, through his stomach and pancreas, severed the vena cava, and hit his spine. The vena cava is the vein above and below the heart that returns all the blood to the heart. Puncturing the vena cava can cause a person to bleed a lot and cause death. Dr. Glenn testified it would be difficult for a person to intentionally aim for that vein. The knife traveled 5-6 inches through the abdominal cavity before hitting Holloway's spine. The stab wound caused massive internal bleeding, but Holloway did not die immediately. Although he might have survived had he sought immediate medical attention, Holloway did not call 911 or seek medical treatment. Later that morning, Holloway was discovered dead in his car. There was a substantial amount of blood in and around the vehicle. The stab wound was the cause of his death. Holloway had hydrocodone, morphine, and THC in his system when he died.

According to Kanatzar, he thought Holloway was only cut; he did not expect Holloway to die from the knife wound because Holloway did not react as if he had been badly hurt. Kanatzar testified he did not think Holloway was reaching into his car during the altercation, and he admitted he never saw a gun other than the one in Holloway's car. Because he feared retaliation, Kanatzar fled to Colorado, but 19 days later he surrendered to law enforcement outside his mother's apartment.

7

Kanatzar's mother told police that Kanatzar and Price were close when they were younger and she thought that the incident had to do with Price. Price said Kanatzar never said anything that made her think he stabbed Holloway for her, and she did not ask Kanatzar to retaliate for her. Holloway's brother told police that Holloway committed the drive-by shooting and he believed Holloway was killed as retaliation for it. From jail, Kanatzar told his father that he could beat the charge. He said he did not know what his defense was going to be yet, but he noted that Kansas was a "no duty to retreat" state.

The State charged Kanatzar with intentional second-degree murder. The trial court instructed the jury to consider self-defense as an affirmative defense to the charge of intentional second-degree murder. Over Kanatzar's objection, the trial court also instructed the jury on the lesser included offense of imperfect self-defense voluntary manslaughter. Kanatzar wanted an "all or nothing" approach.

During deliberations, the jury asked the trial court whether the intent element of second-degree murder attached to the act of stabbing or the act of killing. The trial court responded that the intent element attached to the act of killing. Not long thereafter, the jury convicted Kanatzar of the lesser included charge of voluntary manslaughter. Using a criminal history score of A, the trial court imposed a presumptive 233-month prison sentence.

Kanatzar timely appeals.

I.    WAS THERE SUFFICIENT EVIDENCE TO SUPPORT A CONVICTION FOR VOLUNTARY MANSLAUGHTER?

Kanatzar contends that the evidence did not support simultaneous findings that (1) he sincerely believed that circumstances justified the use of deadly force and (2) his

8

belief was objectively unreasonable. He argues the trial evidence could support either finding but not both.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The State had to prove that Kanatzar knowingly killed Holloway "upon an unreasonable but honest belief that circumstances existed that justified use of deadly force" in defense of a person. See K.S.A. 2018 Supp. 21-5404(a)(2). Thus, the State had to provide sufficient evidence of both Kanatzar's subjective, honest belief that deadly force was necessary to defend himself against Holloway and that Kanatzar's belief was objectively unreasonable. See *State v. Fisher*, 304 Kan. 242, 258, 373 P.3d 781 (2016).

There is sufficient evidence to support the jury's conclusion that Kanatzar honestly believed that deadly physical force was necessary to prevent his own death or great bodily harm. Kanatzar was very familiar with the violence and drug use in North Topeka. He knew of Holloway's reputation for violence and for carrying weapons. He knew his cousin had been shot just days before, he saw Holloway's revolver in his car, and he believed Holloway had suddenly become angry at him about the lawnmower. Kanatzar testified he assumed Holloway was armed and he thought that Holloway was grabbing a gun out of his jacket. He reached for his pocket knife because he thought Holloway was going to shoot him, and he stabbed Holloway so he could get away without being shot. Given what Kanatzar knew of Holloway, the jury concluded Kanatzar honestly believed he was justified in defending himself with deadly force.

9

Kanatzar argues the jury had to accept "the gist of his testimony" to find he had an honest belief that self-defense was warranted. If the jury accepted Kanatzar's version, then the jury could not find he acted unreasonably. He argues that, with regard to self-defense, the jury had a binary choice:  Accept his testimony and find that he was acting in self-defense, or reject that testimony and conclude that he was not acting in perceived self-defense. We find this argument unpersuasive. It is simply a restatement of Kanatzar's "all or nothing" approach to the case and suggests the jury was required to find the killing was justified as a matter of self-defense. The jury's finding of an honest belief does not preclude its determination that the belief was objectively unreasonable because the jury was not required to believe all of Kanatzar's testimony, nor was Kanatzar's testimony the only evidence evaluated by the jury.

Kanatzar cites *State v. Cates*, 223 Kan. 724, 576 P.2d 657 (1978), in support of his argument. In *Cates*, the State charged the defendant with premeditated and felony murder; a jury convicted him of second-degree murder. The defendant contended that he acted in self-defense. On appeal, the defendant argued the trial court erred by not instructing the jury on the lesser included offense of involuntary manslaughter based on excessive force. The Supreme Court disagreed because the defendant's testimony only supported a finding that he "acted in self-defense when confronted with a gun held in the hand of a person who had previously threatened to kill if and when he found" him. 223 Kan. at 728. If the jury believed Cates, then the homicide was justified because he acted in self-defense to repel a deadly force. 223 Kan. at 729. We do not view *Cates* as establishing any controlling legal analysis in this case. *Cates* is fact-driven and based on a prior version of the involuntary, rather than voluntary, manslaughter statute. The evidence did not suggest that Cates acted honestly but unreasonably. The victim had a gun in his hand pointed at Cates when he was killed. Here, there is no evidence that Holloway was pointing a weapon at Kanatzar when he was killed.

10

The jury rejected Kanatzar's perfect self-defense claim to the killing. And although there is evidence which, if believed, could support a reasonable belief that deadly force was needed, when viewing the evidence in the light most favorable to the prosecution, we find that a rational fact-finder could find Kanatzar guilty of voluntary manslaughter based on imperfect self-defense.

An objective review of the evidence shows that no witness saw Holloway with a weapon at the time Kanatzar stabbed him. There is no evidence that Holloway had a weapon on him as Kanatzar believed. Yet, Kanatzar's actions were predicated upon his belief Holloway had a weapon in his jacket. Ultimately, Kanatzar admitted he did not ever see a gun on Holloway's person, and the only weapon was in Holloway's car. The eyewitnesses, other than Kanatzar, placed Holloway out of reach of the car when Kanatzar stabbed him. And even Kanatzar testified he did not think Holloway was trying to get in his car where the gun was located. From this evidence, the jury could conclude it was not objectively reasonable for Kanatzar to believe that he was in danger of imminent death or great bodily injury. Furthermore, if the jury accepted Eastman's version of events, the stabbing occurred simultaneously with the handshake, and there was no extended conversation between Kanatzar and Holloway as described by Kanatzar. The time-stamp on the Kwik Shop video shows only 20 seconds elapsed from the time Holloway waved at Bulger in the store and turned back towards his car until Bulger saw Holloway stumbling in the parking lot after the stabbing. This timing is more consistent with Eastman's version and could certainly cast doubt on Kanatzar's rendition of events. One lynchpin of Kanatzar's self-defense claim—Holloway's threat to shoot him in the head—could have been disbelieved by the jury. No other witness heard any threat, and no other witness described Holloway as reaching into his coat as if to draw a weapon. The jury might have believed no witness heard any threat because Holloway's car and radio were loud, but the jury could have concluded that no one heard a threat because none was made. The jury was not required to believe everything Kanatzar testified to when it considered whether it was subjectively or objectively reasonable for him to believe he

11

was in danger of imminent death or great bodily harm. When viewed in the light most favorable to the prosecution, we find there is sufficient evidence to support the voluntary manslaughter conviction.

II.      WAS IT CLEAR ERROR FOR THE TRIAL COURT NOT TO INSTRUCT THE JURY ON RECKLESS INVOLUNTARY MANSLAUGHTER?

Kanatzar contends that the trial court erred by failing to instruct the jury on the lesser included offense of reckless involuntary manslaughter. The process an appellate court undertakes when reviewing challenges to a jury instruction was recently outlined by our Supreme Court.

> "'We must first decide whether the issue has been preserved. Second, we analyze whether an error occurred. This requires a determination of whether the instruction was legally and factually appropriate. We exercise unlimited review of those questions. Next, if we find error, we conduct a "reversibility inquiry."'

> "The standard for the reversibility inquiry depends on whether the instruction was properly requested in district court. If it was requested, the failure to offer it to the jury is grounds for reversal unless the State shows there is no reasonable probability the absence of the error would have changed the jury's verdict. If the instruction was not requested, this court applies a clear error standard to the reversibility inquiry. 'Under that standard, an appellate court assesses whether it is "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' The burden to establish clear error is on the defendant. In examining whether a party has met its burden, we consider the entire record de novo. [Citations omitted.]" *State v. Gentry*, 310 Kan. 715, 720-21, 449 P.3d 429 (2019).

12

*Preservation*

The State contends we should not review the instruction issue because Kanatzar invited any error when he requested that no lesser included offense instructions be given. The doctrine of invited error precludes a party from asking a district court to rule a given way and thereafter challenging the court's ruling on appeal. See *State v. Jones*, 295 Kan. 804, 812-13, 286 P.3d 562 (2012). The invited error doctrine only applies to instructional errors when a party both fails to object and invites an error by other actions. *State v. Logsdon*, 304 Kan. 3, 31, 371 P.3d 836 (2016). When a trial court accedes to the defendant's specific request not to instruct on a factually appropriate lesser included offense because the defense wants an "all-or-nothing" stance, the defendant has invited error and may not complain of the error on appeal. *State v. Angelo*, 287 Kan. 262, 279-80, 197 P.3d 337 (2008). But here, although Kanatzar wanted an all-or-nothing approach, the district court did not accede to that request; it gave the lesser included imperfect self-defense voluntary manslaughter instruction for which Kanatzar was convicted. The invited error doctrine does not apply when the defendant merely fails to request an instruction. See *State v. Sasser*, 305 Kan. 1231, 1235-36, 391 P.3d 698 (2017). We find the invited error doctrine does not apply under these circumstances.

> *We determine an instruction on reckless involuntary manslaughter was legally and factually appropriate.*

There are five degrees of homicide in Kansas. In descending magnitude, they are "capital murder, first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter." *State v. Carter*, 305 Kan. 139, 161, 380 P.3d 189 (2016). Because a lesser included crime includes a "lesser degree of the same crime," an involuntary manslaughter instruction therefore would have been legally appropriate as a lesser degree of the second-degree murder charge faced by Kanatzar. See K.S.A. 2018

13

Supp. 21-5109(b)(1); *State v. Pulliam*, 308 Kan. 1354, 1362, 430 P.3d 39 (2018); *State v. Seba*, 305 Kan. 185, 203, 380 P.3d 209 (2016).

An instruction is factually appropriate when there is sufficient evidence for a rational fact-finder to find for the defendant on that theory. See *Pulliam*, 308 Kan. at 1361. K.S.A. 2018 Supp. 22-3414(3) provides that "[i]n cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 2018 Supp. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime."

In its brief, the State concedes an instruction on involuntary manslaughter was likely factually appropriate, recognizing that a deliberate act can result in an unintentional but reckless killing if the specific intent to kill is not proven. See *State v. Deal*, 293 Kan. 872, 882-83, 269 P.3d 1282 (2012). In other words, a charge of reckless involuntary manslaughter may be appropriate when the act resulting in death was intentional but the defendant did not intend to kill the victim. *State v. McCullough*, 293 Kan. 970, 978-79, 270 P.3d 1142 (2012). Kanatzar testified he did not intend to kill Holloway when he stabbed him, and the unsupported statements of a defendant can be sufficient to provide the foundational basis for a lesser included instruction. See *State v. Clark*, 261 Kan 460, 464, 931 P.2d 664 (1997).

Given the State's concession on the issue and acknowledging that the unsupported statements of a defendant can be sufficient to provide the foundational basis for a lesser included instruction, we conclude, when looking at the evidence in a light most favorable to Kanatzar, that a jury instruction on reckless involuntary manslaughter was factually appropriate. Thus, we conclude the district court erred in failing to instruct on reckless involuntary manslaughter.

14

*The failure to instruct on reckless involuntary manslaughter was not clear error.*

The final step of our inquiry is to apply the clear error standard to the failure of the trial court to instruct on the lesser included offense. Because Kanatzar did not object to the jury instruction below, he has the burden to firmly convince us that the jury would have reached a different verdict if the instructional error had not occurred. See *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018). In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record." *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). Our review of the entire record leaves us unconvinced that the jury would have reached a different verdict had it been instructed on the additional alternative of reckless involuntary manslaughter.

A culpable mental state is an essential element of every crime—"intentionally" being the most serious, followed by "knowingly," and then "recklessly." K.S.A. 2018 Supp. 21-5202(a), (b). All three culpable mental states come into play in this case. For the second-degree murder charge, the State was required to prove the defendant intentionally killed Holloway. See K.S.A. 2018 Supp. 21-5403(a)(1). The jury acquitted Kanatzar of that charge.

The voluntary manslaughter offense for which Kanatzar was convicted is not an intentional crime—the State was required to prove the defendant "knowingly" killed Holloway. See K.S.A. 2018 Supp. 21-5404(a). The jury was orally instructed: "A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about or of the circumstances in which he was acting, or that his conduct was reasonably certain to cause the result complained about by the State."

The involuntary manslaughter charge—which is the subject of the instructional error inquiry—is also not an intentional crime. It is defined as "the killing of a human

15

being committed . . . [r]ecklessly." K.S.A. 2018 Supp. 21-5405(a)(1). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2018 Supp. 21-5202(j).

Kanatzar's arguments for reversibility begin with his observation that the jury rejected the intentional murder charge, which means it determined Kanatzar unintentionally killed Holloway. Kanatzar testified he intended to stab, but not kill, Holloway. That testimony, if believed by the jury, merely established that the killing was not intentional—it was not evidence that the killing was reckless as opposed to knowing. In neither a reckless or knowing killing does the defendant "intend" to kill the victim.

The jury convicted Kanatzar of "knowingly" killing Holloway, meaning that Kanatzar was aware that stabbing Holloway in the abdomen was reasonably certain to cause his death. Kanatzar's task and burden in this appeal is to firmly convince us that the jury would not have returned that verdict if it had been presented the reckless option. To convict Kanatzar of that offense, the jury, rather than finding Kanatzar knew the stabbing was reasonably certain to cause Holloway's death, instead had to find that he consciously disregarded the substantial and unjustifiable risk that death would result and his disregard constituted a "gross deviation from the standard of care which a reasonable person would exercise in the situation." See K.S.A. 2018 Supp. 21-5202(j). Yet, Kanatzar provides no roadmap of evidence to persuade us that the jury would have reached a different result had it been instructed on reckless involuntary manslaughter, nor does he explain how the jury reaches that result in light of the jury's rejection of his perfect self-defense claim.

Next, Kanatzar argues that "the weakness of evidence in support of an imperfect self-defense finding suggests that jurors, given the chance, would have convicted of another, more factually appropriate grade of homicide." He does not offer any legal or

16

factual analysis or explanation how or why a "reckless" killing is a more appropriate grade of homicide than a "knowing" one under the facts of this case.

Kanatzar also contends a reckless instruction would have aligned with his trial defense. The State argued this was an intentional murder. Kanatzar argued it was pure self-defense, and a significant portion of the record focused on the drive-by shooting and on establishing that Holloway was a dangerous person who was willing to shoot others. The jury heard all of that evidence and rejected Kanatzar's pure self-defense claim. And it determined that Kanatzar acted "knowingly" when he stabbed Holloway. Again, Kanatzar does not explain how the inclusion of a reckless alternative would have led the jury to conclude the killing was reckless rather than knowing. Furthermore, because his primary defense was self-defense, the jury was in a position to fully evaluate the imperfect self-defense element of the voluntary manslaughter charge.

Finally, Kanatzar points to the jury's question about intent during deliberations. The jury asked: "Is the act the stabbing or the killing?" The district court properly responded that the act is the killing. Kanatzar argues, "Two hours after receiving a response to its question, the jury acquitted Mr. Kanatzar of *intentional* homicide, and convicted, instead, on an extremely weak charge of *knowing* homicide. This tenuously supported verdict was the likely byproduct of jurors not wishing to fully exonerate a defendant guilty of a reckless killing." We are unpersuaded by this argument.

All of Kanatzar's reversibility arguments are based on the premise that he was acquitted of intentional homicide and convicted on a weak imperfect self-defense finding or an extremely weak lesser charge of *knowing* homicide. Kanatzar does not explain how or why the conviction of knowing homicide is weak, and we do not view it so. The nature of the stab wound alone—through the abdominal wall, stomach, pancreas, vena cava, and all the way to the spine—would reasonably lead the jury to conclude this was a knowing homicide. And Kanatzar does not explain how this evidence supports or is consistent with

17

reckless conduct. We find Kanatzar's self-serving testimony about his intent is not specific evidence of reckless conduct, and we find he failed to identify any other reckless evidence in the record that would lead to a different outcome had there been no instructional error. Having carefully reviewed the entire record, we acknowledge there is some evidence from which a rational fact-finder could find the defendant guilty of the lesser included offense. But we do not view this as a close call. As our Supreme Court has observed: "Clear error sets a high burden for a defendant." *Pulliam*, 308 Kan. at 1370. Kanatzar has not met this high burden to firmly convince us that the jury would have reached a different result had it been instructed on reckless involuntary manslaughter.

III.     DID THE PROSECUTOR COMMIT REVERSIBLE ERROR DURING VOIR DIRE BY DILUTING THE STATE'S "BEYOND A REASONABLE DOUBT" BURDEN OF PROOF?

Kanatzar contends the prosecutor impermissibly diluted the State's burden of proof by improperly defining the term "beyond a reasonable doubt" during jury selection. We find no merit in this argument.

During jury selection, the prosecutor distinguished "reasonable doubt" from "beyond all doubt" and "beyond a shadow of a doubt." Defense counsel objected on the basis that the prosecutor was improperly defining the State's burden of proof. The district court overruled the objection, stating: "You can't give the definition of reasonable doubt, but I'm going to allow him to talk about the difference between the terminology that folks may hear on television. I don't think that's out of line and I will allow that question."

Shortly thereafter, the prosecutor continued:

"I told you that the standard is beyond a reasonable doubt. I told you that it doesn't mean something beyond all doubt, beyond a shadow of a doubt, it means what it says. How

18

many of you want—that's the operative word—want to be convinced beyond all doubt that the defendant committed this murder?"

Defense counsel's renewed objection was overruled by the district court.

Thereafter, the prosecutor continued: "How many of you want that, before you go back in there and deliberate, before you check that guilty box, want to be convinced beyond all doubt?" Several prospective jurors raised their hands, and the prosecutor questioned them individually about what type of evidence they would want to be convinced beyond all doubt. Some jurors indicated they would want to have witnessed an act personally to be convinced beyond all doubt. The prosecutor responded by asking if anyone knew why he could never give those jurors what they wanted. One juror replied: "If you see the crime, you're going to be a witness and can't be on the jury." The prosecutor responded: "Can't happen. That's why the standard isn't beyond all doubt. That's why it is beyond a reasonable doubt. So you can have doubt and still find a person guilty. Does anyone disagree with that?" Defense counsel again objected, and the district court overruled the objection, stating, in part: "You know, I think we have to go on what the—just the basic words say, and obviously, beyond all doubt is different than beyond a reasonable doubt. . . . I will continue to allow this line of questioning."

Based on the foregoing exchanges, Kanatzar claims that by arguing that jurors could doubt a defendant's guilt and still convict him or her of a crime, the prosecutor cleverly diluted the State's burden of proof. The State argues that the prosecutor, rather than attempting to diminish the State's burden of proof, was explaining to the jury pool that "proof beyond a reasonable doubt" is not "beyond all doubt."

19

*Standard of review*

We employ a two-step analysis to review claims of prosecutorial error. First, exercising unlimited review, we determine whether prosecutorial error actually happened. Next, if error is found, we apply a constitutional error analysis.

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Applying the first step of the analysis, we find no prosecutorial error.

A misstatement of the law concerning the measure of reasonable doubt that lowers the State's burden falls outside the wide latitude afforded to prosecutors and constitutes error. *State v. Magallanez*, 290 Kan. 906, 914-15, 235 P.3d 460 (2010). Our courts have warned against efforts to define "reasonable doubt" because such efforts often lead to "'a hopeless thicket of redundant phrases and legalese'" that obscures the State's burden. *State v. Garcia-Garcia*, 309 Kan. 801, 816-17, 441 P.3d 52 (2019). But prosecutors may draw a distinction between the concept of proof beyond a reasonable doubt and proof beyond all doubt, rather than attempt to define reasonable doubt. *State v. Stevenson*, 297 Kan. 49, 53, 298 P.3d 303 (2013); *Mitchell-Pennington v. State*, No. 115,407, 2017 WL 1104599, at *9 (Kan. App. 2017) (unpublished opinion).

In *Garcia-Garcia*, like here, the prosecutor asked the prospective jurors whether they could have doubt and yet still find the defendant guilty. Then the prosecutor said the jurors could find the defendant guilty "if [they] had doubt so long as that doubt was not reasonable." 309 Kan. at 814. The *Garcia-Garcia* prosecutor also told the jurors that the standard for reasonable doubt was "'kind of a two-part test. First you have to determine if you have any doubt . . . . And then you have to determine if that doubt is reasonable.'" 309 Kan. at 814. Our Supreme Court found that the prosecutor "merely echoed the State's burden" rather than altered or lowered the burden. 309 Kan. at 817. There was no error.

Here, the prosecutor merely distinguished beyond a reasonable doubt from beyond all doubt. We find the prosecutor's comments and questions were within the wide latitude afforded to a prosecutor and did not constitute error.

IV.     DID CUMULATIVE ERROR DEPRIVE KANATZAR OF A FAIR TRIAL?

Kanatzar contends that cumulative error deprived him of a fair trial.

The test for cumulative error is whether the totality of the circumstances establishes that a defendant was substantially prejudiced by cumulative errors and was denied a fair trial. A single error cannot support reversal under the cumulative error doctrine. *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Finding but one error by the trial court, we conclude the cumulative error doctrine does not apply.

V.      DID THE DISTRICT COURT PROPERLY SCORE KANATZAR'S CRIMINAL HISTORY AS A?

The district court sentenced Kanatzar to 233 months in prison based on a finding that his criminal history score was A. The following prior person convictions and adjudications appeared in his presentence investigation (PSI) report:

- 2005 Federal Assault on a Correctional Officer;
- 2003 Missouri Robbery 1st Degree;
- 2003 Missouri Robbery 1st Degree;
- 1998 Kansas Juvenile Aggravated Assault;
- 1998 Kansas Juvenile Criminal Threat.

Kanatzar contends his sentence is illegal because the two Missouri robbery convictions should have been scored as nonperson felonies and the two juvenile adjudications should have decayed. He argues he should have had a criminal history score of C with only one person felony—the 2005 federal conviction—and received a lesser sentence.

*Standard of Review*

Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which appellate courts have unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016). And whether a prior conviction should be classified as a person or nonperson offense involves the interpretation of the revised Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2018 Supp. 21-6801 et seq. "Interpretation of a statute is a question of law over which appellate courts have unlimited review." *State v. Keel*, 302 Kan. 560, 571, 357 P.3d 251 (2015), *cert. denied* 136 S. Ct. 865 (2016).

*The Missouri robberies*

A defendant's prior out-of-state convictions are counted when calculating criminal history score. K.S.A. 2018 Supp. 21-6811(e)(1). Out-of-state convictions are classified as felonies or misdemeanors according to the out-of-state jurisdiction's classification. K.S.A. 2018 Supp. 21-6811(e)(2). Here, there is no dispute the Missouri robberies are classified as felonies.

22

Next, the prior convictions are designated as person or nonperson crimes to determine the defendant's criminal history score. In designating an out-of-state crime as person or nonperson,

> "comparable offenses under the Kansas criminal code in effect on the date the current crime of conviction was committed shall be referred to. If the state of Kansas does not have a comparable offense in effect on the date the current crime of conviction was committed, the out-of-state crime shall be classified as a nonperson crime." K.S.A. 2018 Supp. 21-6811(e)(3).

For an out-of-state conviction to be a comparable offense under the Kansas Criminal Code, "the elements of the out-of-state crime cannot be broader than the elements of the Kansas crime. In other words, the elements of the out-of-state crime must be identical to, or narrower than, the elements of the Kansas crime to which it is being referenced." *State v. Wetrich*, 307 Kan. 552, 562, 412 P.3d 984 (2018). The parties agree that *Wetrich*'s "identical or narrower" rule applies to the "comparable offense" determination under the facts of this case.

Both parties acknowledge that in *State v. Cunningham*, No. 118,011, 2018 WL 5726551, at *9 (Kan. App. 2018) (unpublished opinion), *rev. denied* 310 Kan. ___ (September 27, 2019), a panel of this court concluded that the Missouri first-degree robbery statute was narrower than the Kansas aggravated robbery statute. See Mo. Rev. Stat. § 569.020 (2003); K.S.A. 2015 Supp. 21-5420(b). But the parties also acknowledge that the *Cunningham* panel did not consider the argument that Kanatzar makes here regarding the timing of the use of force.

Kanatzer contends that the Missouri first-degree robbery statute is broader than the Kansas robbery statute in one respect and, therefore, his Missouri robbery convictions must be scored as nonperson offenses. He argues that an offender in Missouri may commit robbery by peacefully taking unlawful possession of property and subsequently

23

using force to effectuate an escape with the property. In contrast, he argues, in Kansas an offender commits mere theft when he or she takes peaceful possession of property and subsequently uses force to escape with that property. See K.S.A. 2018 Supp. 21-5801. We agree.

At the time Kanatzar committed his Missouri robberies, Missouri law provided: "A person commits the crime of robbery in the first degree when he forcibly steals property." Mo. Rev. Stat. § 569.020(1) (2003). "[A] person 'forcibly steals' . . . when . . . he uses or threatens the immediate use of physical force upon another person for the purpose of: (a) Preventing or overcoming resistance to the taking of the property *or to the retention thereof immediately after the taking*." (Emphasis added.) Mo. Rev. Stat. § 569.010(1)(a) (2003). Thus, in Missouri, a person commits first-degree robbery when he or she peacefully takes unlawful possession of property and immediately after the taking uses or threatens to use force to overcome resistance in order to retain the property. See *State v. Brown*, 558 S.W.3d 105, 113-14 (Mo. Ct. App. 2018); *State v. Whittaker*, 551 S.W.3d 498, 501-02 (Mo. Ct. App. 2018).

By contrast, in interpreting the Kansas robbery statute, our Supreme Court has determined a person commits mere theft when he or she peacefully takes unlawful possession of property and after the taking uses force to overcome resistance and escape with the property. See K.S.A. 2018 Supp. 21-5801; *State v. Plummer*, 295 Kan. 156, 165-68, 283 P.3d 202 (2012); *State v. Bateson*, 266 Kan. 238, Syl. ¶¶ 1-3, 970 P.2d 1000 (1998); *State v. Carter*, 55 Kan. App. 2d 511, 515-17, 419 P.3d 55 (2018), *petition for rev. granted* 309 Kan. 1350 (2019). Because theft in Kansas is a nonperson crime, see K.S.A. 2018 Supp. 21-5801, if theft is the comparable crime to a form of Missouri first-degree robbery, then the Missouri robbery convictions should be scored as nonperson crimes.

24

However, the State argues that even assuming both Missouri crimes were committed in this one way that would not be robbery in Kansas, i.e., by the use of or threat to use physical force to retain property after it was stolen, in addition to theft, Kanatzar would have also committed battery or assault, which are both person crimes. Thus the State concludes that the use of or threat to use physical force required by the Missouri statute to retain the property would be a separate but comparable crime in Kansas of battery and/or assault, depending on the facts. But the State fails to provide any analysis comparing the relevant portion of the Missouri first-degree robbery statute to Kansas assault or battery crimes. If either Kansas battery or assault is not comparable, then the convictions must be scored as nonperson crimes because—absent a battery or assault—theft would be the comparable offense.

For analysis purposes, we assume the Missouri convictions arose under circumstances which do not fall within the ambit of the Kansas robbery statute, i.e., when a defendant peacefully takes unlawful possession of the property and after the taking, "threatens the immediate use of physical force upon another person." See Mo. Rev. Stat. § 569.010(1) (2003). In Kansas, "Assault is knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2015 Supp. 21-5412(a). Comparing the elements of that portion of the Missouri first-degree robbery statute, we conclude that the Missouri first-degree robbery statute is broader than the Kansas crime of assault.

The statutory elements in Missouri are not identical or narrower than Kansas— assault in Kansas requires another person be knowingly placed in reasonable apprehension of immediate bodily harm, while under the Missouri robbery statute, there is no requirement that a person be placed in apprehension of immediate bodily harm. See K.S.A. 2015 Supp. 21-5412(a); Mo. Rev. Stat. § 569.010(1) (2003). Stated another way, the making of the threat is sufficient to violate Missouri law, while in Kansas, the threat must result in the victim's apprehension of immediate harm. So the Missouri statute is

25

broader than the Kansas assault statute because it criminalizes threats beyond those which knowingly place another in reasonable apprehension of immediate bodily harm. Because the Missouri first-degree robbery law is not identical or narrower than the Kansas robbery or assault statutes identified by the State as comparable, it was error to score the Missouri robberies as person crimes.

*The Juvenile Adjudications*

Kanatzar next challenges the scoring of his two juvenile adjudications. He admits the adjudications were person felonies but contends they have decayed under Kansas law. When an adjudication decays, it is no longer considered in determining an offender's criminal history score. K.S.A. 2018 Supp. 21-6803(e); *State v. Smith*, 49 Kan. App. 2d 88, 90, 304 P.3d 359 (2013). The law governing the decay of juvenile adjudications has changed over time, so we must determine which version of the law applies to Kanatzar's sentence.

The State argues that the version of K.S.A. 21-6810 in effect at the time Kanatzer committed his current crime in 2015 is the appropriate law to be applied. When Kanatzer committed his current crime, juvenile adjudications for person felonies were excluded from decay. "There will be no decay factor applicable for . . . a juvenile adjudication for an offense which would constitute a person felony if committed by an adult." K.S.A. 2015 Supp. 21-6810(d)(3)(B). "'[D]ecay factor' means prior convictions that are no longer considered as part of an offender's criminal history score." K.S.A. 2015 Supp. 21-6803(e). Because both of Kanatzar's juvenile adjudications are based on person felonies, the State argues the adjudications do not decay.

Kanatzer argues that the version of the law in effect at the time he was sentenced should apply. At that time, K.S.A. 2018 Supp. 21-6810(d)(3)(B) no longer had a blanket

26

exclusion from decay for adjudications for person crimes. On the date Kanatzar was sentenced, the applicable decay provision provided:

> "Except as otherwise provided, a juvenile adjudication will decay if the current crime of conviction is committed after the offender reaches the age of 25, and the juvenile adjudication is for an offense . . . committed on or after July 1, 1993, which would be a nondrug severity level 5 through 10 felony, a nongrid felony or any drug felony, if committed by an adult." K.S.A. 2017 Supp. 21-6810(d)(4)(B).

Applying that statute to his case, Kanatzar argues that because he was 37 years old when he committed his current crime of conviction and his 1998 adjudications for aggravated assault and criminal threat were classified as severity level 7 and 9 person felonies respectively, both juvenile adjudications would have decayed. See K.S.A. 21-3410 (Furse 1995); K.S.A. 21-3419 (Furse 1995).

The State points to the decisions of multiple panels of our court which hold that amendments to K.S.A. 21-6810 are not retroactive—meaning the decay factor should be determined based on the law in effect at the time of the defendant's current crime of conviction. See, e.g., *State v. Anderson*, No. 118,613, 2018 WL 6711318 (Kan. App. 2018) (unpublished opinion), *rev. denied* 310 Kan. ___ (September 9, 2019). See also *State v. Sheppard*, 56 Kan. App. 2d 1193, 1203-04, 444 P.3d 1006 (2018) (citing numerous cases that 2016 amendments to K.S.A. 21-6810 do not apply retroactively), *rev. denied* 311 Kan. ___ (December 31, 2019). Kanatzar acknowledges those cases but contends they are wrongly decided. He argues it should not matter whether decay amendments have retroactive effect because the KSGA does not say that a defendant's criminal history score is calculated based upon the prior convictions which exist at the time he or she committed the current crime of conviction. Rather, "'criminal history' means and includes an offender's criminal record of adult felony . . . and comparable juvenile adjudications *at the time such offender is sentenced.*" (Emphasis added.) K.S.A.

2018 Supp. 21-6803(c). And he argues that by the time the district court sentenced him in 2018, the statutory amendments had decayed his two juvenile person felonies.

While it is true that criminal history is based on convictions and adjudications as of the time of sentencing, determining what counts as a conviction or adjudication is determined based on the law at the time the current crime of conviction was committed.

> "Because it is a fundamental rule of sentencing that the penalty parameters for a crime are established at the time the crime was committed, the classification of a prior conviction or juvenile adjudication for criminal history purposes under the KSGA must be based on the classification in effect for the comparable offense when the current crime of conviction was committed." *State v. Keel*, 302 Kan. 560, Syl. ¶ 9.

Kanatzar's interpretation disregards this fundamental principle.

We agree with the legal analyses in *Anderson* and *Sheppard* and the numerous cases cited in those opinions. The 2016 amendments to the decay provisions of K.S.A. 21-6810 are substantive rather than procedural in nature and therefore do not apply retroactively. At the time he committed his 2015 crime, juvenile adjudications for person crimes did not decay and subsequent amendments to K.S.A. 21-6810 do not operate to Kanatzar's benefit.

We find that both of Kanatzar's juvenile adjudications from 1998 qualify as person felonies for purposes of his criminal history score. Because he does not challenge his 2005 federal person felony, we find Kanatzar has three person felonies, and the district court properly sentenced him under a criminal history score of A.

Affirmed.

28